# EXHIBIT 1

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**The premises located at 5614 River Road, Live Oak,<br>Florida 32060, as further described in Attachment A** | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:23-mj- 1392 -JBT

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The premises located at 5614 River Road, Live Oak, Florida 32060, as further described in Attachment A.

located in the _____Middle_____ District of _____Florida_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252 & 2252A | Transportation, receipt, distribution, possession, and access with intent to view child pornography |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ashley Wilson, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date: __8/22/23__

_____
*Judge's signature*

City and state: _____Jacksonville, FL_____

Joel B. Toomey, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Ashley Wilson, being duly sworn, hereby state as follows:

1.     I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), an agency of the United States Department of Homeland Security (DHS) and have been so employed since October 2007. I am currently assigned to the Office of the Assistant Special Agent in Charge Jacksonville, Florida, where I conduct a variety of investigations. Prior to this assignment, I was assigned to the Office of the Deputy Special Agent in Charge Laredo, Texas, for approximately 6 years also as a Special Agent. I have a bachelor's degree in criminal justice. I am a law enforcement officer of the United States and am thus authorized by law to engage in or supervise the prevention, detection, investigation or prosecution of violations of federal criminal law. I am responsible for enforcing federal criminal statutes under the jurisdiction of HSI, including violations of law involving the exploitation of children. I participated in a 22-week training program at the Federal Law Enforcement Training Center in Brunswick, Georgia, which included the Criminal Investigator Training Program and ICE Special Agent Training. In my capacity as a Special Agent, I have participated in numerous types of investigations, during which I conducted or participated in physical surveillance, undercover transactions and operations, historical investigations, and other complex investigations. Since becoming a Special Agent, I have worked with experienced Special Agents and state and local law enforcement officers who also investigate child exploitation offenses.

2.     I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§

2251, 2252, 2252A, 2422, and 2423, as well as Florida state statutes that criminalize sexual activity with minors and other methods of child sexual exploitation. In connection with such investigations, I have served as the case agent and have served as an undercover agent in online child exploitation cases. During the course of my investigations, I have worked closely with members of the local child exploitation task force comprised of agents and officers, from HSI, the Federal Bureau of Investigation (FBI), the Florida Department of Law Enforcement (FDLE), the Jacksonville Sheriff's Office (JSO), the St. Johns County Sheriff's Office (SJSO), and the Clay County Sheriff's Office (CCSO), among other agencies. These agencies routinely share information involving the characteristics of child sex offenders, as well as investigative techniques and leads. As a federal agent, I am authorized to investigate and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.    This affidavit is based upon my personal knowledge, experience, and training, as well as other information developed during the course of this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, fruits, instrumentalities, other items illegally possessed, and evidence of violations of 18 U.S.C. §§ 2252 and/or 2252A, are present in the location to be searched.

4.    I make this affidavit in support of an application for a search warrant for authority to search the premises located at 5614 River Road, Live Oak, Florida 32060 (the

"Subject Location"), as more particularly described in Attachment A, which includes several outbuildings, as well as any computer and computer media and electronic storage devices located therein. I also request authority to seize any and all items listed in Attachment B as evidence, fruits, and instrumentalities of criminal activity specified herein.

## STATUTORY AUTHORITY

5.    This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors. Based upon my training and experience, as well as conversations with other experienced law enforcement officers, computer forensic examiners, and federal prosecutors, I know the following:

a.    18 U.S.C. § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails.

b.    18 U.S.C. § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

c.    18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of

3

minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

        d.    18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a

4

person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.     The following definitions apply to this Affidavit:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit poses or positions.

b.     "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear

5

that an identifiable minor is engaged in sexually explicit conduct). *See* 18 U.S.C. §§ 2252 and 2256(2).

      c.    "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format. *See* 18 U.S.C. § 2256(5).

      d.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

      e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices

(including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      h.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device.

      i.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software,

7

documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      j.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) may assign a unique and different number to a computer at different times that it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

      k.    "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending,

8

receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

l.      A "smart phone" is a portable device that combines mobile telephone and computing functions into one unit. They are distinguished from feature phones (mobile telephone with minimal features) by their stronger hardware capabilities and extensive mobile operating systems, which facilitate wider software, Internet (including web browsing over mobile broadband), and multimedia functionality (including music, video, cameras, and gaming), alongside core phone functions such as voice calls and text messaging.

m.      A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

n.      A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.

9

However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## COMPUTERS AND CHILD PORNOGRAPHY

7.      Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. In the past, child pornography was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and significant skill to develop and reproduce the images. There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

8.      The development of computers has radically changed the way that child pornographers manufacture, obtain, distribute, and store their contraband. Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

10

9.   Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner. Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device. Digital cameras, as well as "smart" phones such as the Android device, have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

11.   The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12.   Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo!, Hotmail, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides email services as

11

well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.     As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they can record communication in transcript form, often show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's

12

Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Computer storage devices (e.g., hard drives, compact disks ("CDs"), diskettes, tapes, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of

13

computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media by a computer user.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15.    Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

14

a.      Many individuals who traffic in and trade images of child pornography also collect child pornography. Many individuals who collect child pornography have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.      Many individuals who collect child pornography also collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.      Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

d.      Some individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding

15

comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

      e.    Some individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

      f.    Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet. Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, and/or distribute

16

child pornography by computer devices using the Internet often maintain and/or possess the items listed in Attachment B.

16.     Based on my training and experience, I also know that, with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis. However, as referenced above, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Furthermore, even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favorite images involving a particular child or act is often maintained on the device.

17.     Based on my training and experience, I know that within the last several years, individuals who have a sexual interest in minor children have used the Internet and Internet-enabled devices with increasing frequency to make contact with and attempt to establish relationships with potential child victims. These individuals may perceive that the Internet provides some degree of anonymity and safety from prosecution. Because more and more children are using the Internet and Internet enabled devices, these individuals potentially expose more and more child victims to online sexual exploitation. These individuals may contact potential child victims through social networking websites such as Facebook and Twitter or may engage in online conversations with children through text messaging and email. During these online conversations, photographic images and links to Internet

17

websites can be easily exchanged between the individual and the targeted child. Based on my training and experience, I know that when such an individual uses text messaging, email, or other websites to have online contact with children, the Internet-enabled device used, whether it is a computer, a cellular telephone, a "smart" phone such as an Android device, or a tablet such as an "iPad," often saves and maintains evidence of such contacts. This evidence can often be extracted and examined by a trained forensic examiner.

18.     Content on smart phones and other wireless telephones and electronic devices can also be easily transferred with the stroke of a key to other electronic devices or backed up on cloud-based storage devices. I know from my training and experience, that individuals often back-up their digital files on one electronic device to another, and that current technology permits users to read, write and transfer data between devices. I have executed search warrants where multiple electronic devices have been seized and the forensic examination has identified back-up copies of content from wireless telephones on other computer devices seized from the same residence. I have also executed search warrants where child pornography was discovered on multiple devices seized from different rooms of the same residence and purportedly primarily used by different residents within the same home.

## UNLOCKING ELECTRONIC DEVICES USING BIOMETRIC FEATURES

19.     I know from my training and experience, as well as publicly available materials, that encryption systems for mobile/smart phones and other electronic devices are becoming ever more widespread. Such encryption systems protect the contents of these devices from unauthorized access by users, and render these contents unreadable to anyone

who does not have the device's password.   As device encryption becomes more commonplace, the encryption systems implemented by device manufacturers are becoming more robust, with few—if any—workarounds available to law enforcement investigators.

20.    I also know that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

21.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  Examples of such devices providing a fingerprint unlocking capability are several models of Apple's iPhone, as well as several phones, including but not limited to the Samsung Galaxy, which use the Android operating system. Apple iPhones may be fingerprint unlocked using a function called Touch ID, which during setup allows for registering as many as five (5) fingerprints to unlock the device. Samsung's Galaxy S8 and S8+ models may be configured to be unlocked with as many as four (4) fingerprints. In fact, the number of electronic devices providing a fingerprint unlocking capability, including both smart phones and laptops, is growing continually.

22.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."   During the Trusted Face

19

registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based upon the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

23.     If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

24.     In my training and experience, users of electronic devices often enable the above-mentioned biometric features because they are considered a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. In some instances, biometric features are considered a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

25.     Related to the above discussion regarding encryption, if a forensic

examination is not conducted shortly after seizing the device while it is in an unlocked state or unlocking the device using biometric features immediately upon seizing it, law enforcement investigators may completely lose the ability to forensically examine the device, assuming the device's owner refuses to disclose the password. The passcode or password that would unlock any such device subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

26.     Biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when:  1) more than 48 hours has elapsed since the device was last unlocked; or 2) when the device has not been unlocked using a fingerprint for eight (8) hours and the passcode or password has not been entered in the last six (6) days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four (4) hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

27.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of these biometric features, the warrant I am applying for would permit law enforcement personnel to: 1) press

21

or swipe the fingers (including thumbs) of Steven Lee CARTY, whom I have probable cause to believe is the user of the device(s), to the fingerprint scanner of the device(s); 2) hold the device(s) in front of the face of Steven Lee CARTY and activate the facial recognition feature; and/or 3) hold the device(s) in front of the face of Steven Lee CARTY and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. In the event that law enforcement is unable to unlock the subject device(s) within the number of attempts permitted by the pertinent operating system, this will simply result in the device(s) requiring the entry of a password or passcode before it can be unlocked.

28.     Due to the foregoing, I request that the Court authorize law enforcement personnel to press the fingers (including thumbs) of Steven Lee CARTY; hold the device(s) in front of the face of Steven Lee CARTY and activate the facial recognition feature; and/or hold the device(s) in front of the face of Steven Lee CARTY and activate the iris recognition feature, to unlock the electronic devices that may be seized at the Subject Location, so that investigators may conduct the search and examination as described in this Affidavit and Attachment B.

## THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN AND CYBERTIPLINE REPORTS

29.     The National Center for Missing and Exploited Children ("NCMEC") is a private, non-profit organization established in 1984 by the United States Congress. Primarily funded by the Department of Justice, the NCMEC acts as an information clearinghouse and resource for parents, children, law enforcement agencies, schools, and

communities to assist in locating missing children and to raise public awareness about ways to prevent child abduction, child sexual abuse and depictions of minors engaged in sexually explicit conduct.

30.    The NCMEC CyberTipline offers a means of reporting incidents of child sexual exploitation, including the possession, manufacture, and/or distribution of depictions of minors engaged in sexually explicit conduct; online enticement; child prostitution; child sex tourism; extra familial child sexual molestation; unsolicited obscene material sent to a child; and misleading domain names, words, or digital images.

31.    Federal law requires the NCMEC to operate the CyberTipline and requires Electronic Service Providers (ESPs) to report apparent instances of child pornography offenses. ESPs also have the discretion to submit reports concerning planned or imminent child pornography offenses. Companies that suspect child pornography has been stored or transmitted on their systems report that information to the NCMEC in a CyberTipline Report. The ESP submits the report, which generally contains account and log-in information, and uploads content to the NCMEC via a secure connection. Aside from required information, such as incident type, date, and time, reporters can also fill in voluntary reporting fields such as user or account information, IP addresses, or information regarding the uploaded content itself, as well as other information it may have collected in connection with the suspected criminal activity. The ESP may or may not independently view the content of the file(s) it uploads. Using publicly available search tools, the NCMEC then attempts to locate where the activity occurred based on the information the ESP submits, such as IP addresses. The NCMEC then packages the information from the ESP,

along with any additional information it has, such as previous related CyberTipline Reports, and sends it to law enforcement in the jurisdiction where the activity is believed to have occurred.

## VIRTUAL PRIVATE NETWORK (VPN) INFORMATION

32.     The following information has been provided to me by other experienced law enforcement officers and also comes from online research that I have conducted as well as my training and experience. I know that individuals often use a Virtual Private Network ("VPN") in an attempt to remain anonymous while connected to the Internet. A VPN is typically a paid service that keeps an individual's web browsing secure and private. In some cases, VPNs can get past regional restrictions for various video and music-streaming sites and help individuals evade government censorship restrictions. Based on my training and experience, and conversations with other law enforcement officers, a VPN can also be used by individuals involved in illegal activity on the Internet to avoid being detected by law enforcement. A VPN can be thought of as a secure tunnel between a user's computer, or any other Internet-enabled device, and the destinations a user visits on the Internet. The user's computer, or other Internet-enabled device, connects to a VPN server, which can be located in the United States or any other foreign country, such as the Netherlands, Germany, or Australia, in this case. The VPN user's activity on the Internet is then passed back and forth through that specific server, and as a result, it appears the user is browsing the Internet from that server's geographical location instead of the user's actual computer or Internet-enable device.

24

## FACTS ESTABLISHING PROBABLE CAUSE

33.    I make this affidavit in support of a search warrant for the Subject Location that I believe to be currently occupied by Steven Lee CARTY and Violet Ann Thompson after conducting physical surveillance at the Subject Location and querying the Florida Driver and Vehicle Identification Database ("DAVID"). This affidavit is based upon information provided to me both verbally and in written documentation from other law enforcement officers and personnel, to include Florida Department of Law Enforcement ("FDLE") Special Agent ("SA") Craig Riley, as well as through an investigation that I personally conducted as set forth herein. I have personally seen recent photos and a video that CARTY took of the premises and posted on his public Facebook page. In addition, I requested and was subsequently provided with aerial photos and a recording of the premises taken by Customs and Border Protection (CBP) Officers on August 10, 2022. I have also had conversations and viewed images of the premises with SA Riley, who has personally observed the premises, and it appears as set forth in Attachment A. My review of CARTY's photos and video, and CBP Officers' aerial footage of the premises revealed at least three visible structures located on the premises.

34.    HSI is investigating the use of one or more computer devices, smart phones, and/or electronic storage media at the Subject Location to commit violations of 18 U.S.C. §§ 2252 and 2252A, which prohibit the transportation, receipt, distribution, possession, and access with intent to view child pornography, that is, visual depictions of one or more minors engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256.

35.    During June 2023, I learned FDLE SA Riley initiated an investigation into

25

CARTY after receiving a CyberTipline Report from the NCMEC. On July 24, 2023, I received CyberTipline Report number 160009245 from FDLE SA Riley via email and reviewed it in its entirety. According to CyberTipline Report number 160009245, Google reported "Steven Carty," with phone numbers (386) 230-8514 and (386) 688-5374, date of birth 08/06/1968, and email addresses scarty2268@gmail.com and scarty2268@yahoo.com, for uploading one file containing child exploitation material over the Internet using his Google account on April 9, 2023, at 01:54:44 UTC using IP address 138.199.6.232. Google provided login IP addresses, an upload IP address, and the file containing child exploitation material in the report to NCMEC. Google indicated it had reviewed the child exploitation material. Google stated the reported content was stored in the Google Photos infrastructure of the account. The reported image file is titled *report_[1508919].jpg*, which I have reviewed, and a description is as follows:

> The color image depicts two females who are not wearing any clothing around their genital area. Both females are on a bed bending over in an unnatural manner. One female is on her hands and knees, with her legs spread apart, thereby exposing her bare anus and vagina. Her face cannot be seen. The second female is on her hands and feet, with her legs spread apart, thereby exposing her anus and vagina. Her face can be seen as she is looking back towards the camera. The focal point of the image appears to be the female child's genitals and both females lack pubic hair. The words "LS-MAGAZINE" is seen in the top left corner of the image. I know, based on my training and experience, and conversations with other law enforcement officers, "LS-MAGAZINE" refers to a well-known Ukrainian child modeling agency that operated between 2001 and 2004. The agency disseminated series of pornographic photos and videos of child models under brands such as LS-Magazine, LS-Models, LS-Island, LS-Land, LS-Dreams, etc. Over 1,500 children, both identified and unidentified to date, were recruited and exploited during this time. Based on my training and

experience, having seen other images within the same series that depict the same two females, and knowing the LS series has produced child pornography files, I believe the file depicts at least one minor engaged in sexually explicit conduct, that is lewd and lascivious exhibition of genitals, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

36.     Through a search of open-source records, I learned that IP address 138.199.6.232 is an international IP address that resolves to Zurich, Switzerland and is owned by Datacamp Limited, a web hosting company based out of London, United Kingdom. During this time when CARTY was connected to an international IP address, I believe CARTY was utilizing a VPN. Based on my training and experience, and previous investigations I have conducted, individuals often use a VPN to conceal their illegal Internet activity. In this case, I believe CARTY attempted to evade law enforcement by connecting to a VPN when the image containing child sexual abuse material (CSAM) was uploaded over the Internet using his Google account on April 9, 2023.

37.     In CyberTipline Report number 160009245, Google provided a list of IP addresses that revealed CARTY logged into his Google account 36 times from April 3, 2023, through April 9, 2023, using IP address 173.188.197.110. According to open-source research, the IP address resolved to Windstream. FDLE SA Riley told me he caused a subpoena to be issued to Windstream on July 7, 2023, requesting subscriber information for IP address 173.188.197.110 on April 9, 2023, at 00:19:58 UTC, which is when CARTY logged into his Google account. This was less than two hours prior to the time CARTY uploaded CSAM. I learned from reviewing the Windstream response that Windstream provided the requested information to FDLE SA Riley on July 10, 2023. The information

provided listed the account as in service and the subscriber as Violet Thompson, with a residential address of 5614 River Road, Live Oak, Florida 32060 (the Subject Location). According to Windstream, IP address 173.188.197.110 was assigned to the Subject Location from April 2, 2023, at 22:46:06 Central Time to April 11, 2023, 15:03:11 Central Time.

38.     During our conversations about the initial investigation he conducted, FDLE SA Riley told me he applied for and obtained a state search warrant to search the contents of CARTY's Google account that was reported in CyberTipline Report number 160009245, scarty2268@gmail.com. FDLE SA Riley told me he issued the state search warrant to Google on July 7, 2023, and received return information from Google on July 18, 2023, which I have reviewed. FDLE SA Riley told me during his review of CARTY's Google account, in addition to the reported file in CyberTipline Report number 160009245, he discovered other files containing CSAM. On August 10, 2023, I met with FDLE SA Riley at the HSI office in Jacksonville and we reviewed the additional files containing CSAM that were stored in CARTY's Google account. One of the files containing CSAM that was stored within Google Photos is titled [*mum-playing-with-daughters*].mp4 and described as follows:

> The color video is 2 minutes and 27 seconds in length and depicts an adult female and a prepubescent female child on a bed. The adult female is completely nude except for black stockings that stop at mid-thigh. The prepubescent female child is completely nude except for a pink piece of clothing that is wrapped around her waist. The adult female positions the prepubescent female child on her and penetrates the child's vagina with her tongue. The adult female then adds an unknown substance to the female child's genital area and digitally penetrates the child's vagina and anus. The female child is visibly upset and attempts to push the adult female away. The adult female then forcefully flips the

28

female child over, placing her on her knees with her buttocks in the air. The adult female digitally penetrates the female child once again and spanks the child's bare buttocks. The adult female forces herself on top of the female child and rubs her vagina on the child's buttocks. The adult female then forcefully flips the female child over onto her back and once again forces herself onto the female child, rubbing her vagina on the female child's vagina. I believe the video depicts a prepubescent female child based upon the lack of pubic hair, lack of breast development, and her child-sized body. Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, that is oral-genital sexual intercourse and digital penetration of the genitals, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

39. On the same day, I reviewed additional records provided by Google for Google account scarty2268@gmail.com. The billing information added to the account on February 8, 2023, was a Visa card in the name of "Steven Carty" with the same address as the Subject Location and phone number (386) 688-5374. Additionally, I learned through conversations with FDLE SA Riley, CARTY has an account at Wal-Mart listing (386) 688-5374 as his current phone number and scarty2268@yahoo.com as his current email address. On August 21, 2023, I confirmed CARTY's account information with Wal-Mart personnel.

40. During my review of the CyberTipline Report number 160009245, I learned of additional CyberTipline Reports that were related to CARTY. On August 10, 2023, I requested the additional CyberTipline Reports from the NCMEC and received them on August 11, 2023, from the HSI NCMEC Liaison located at the HSI Cyber Crimes Center in Virginia. The information I received contained the CyberTipline Reports and reported files containing suspected child exploitation material.

41. On August 15, 2023, I reviewed one of those CyberTipline Reports I received,

CyberTipline Report number 160076557, in its entirety. According to CyberTipline Report number 160076557, Google reported "Steven Carty," with phone numbers (386) 230-8514 and (386) 688-5374, date of birth 08/06/1968, and email addresses scarty2268@gmail.com and scarty2268@yahoo.com, for uploading 14 files containing child exploitation material over the Internet using his Google account from April 1, 2023, through April 9, 2023. Google provided upload IP addresses and a list of login IP addresses similar to the list that was provided in CyberTipline Report number 160009245. The list of login IP addresses provided in CyberTipline Report number 160076557 also shows CARTY logged into his Google account 36 times from April 3, 2023, through April 9, 2023, using IP address 173.188.197.110, which resolved to Windstream and was assigned to the Subject Location from April 2, 2023, at 22:46:06 Central Time to April 11, 2023, 15:03:11 Central Time. Google stated the reported content was stored in the Google Photos infrastructure of the account.

42.    CyberTipline Report number 160076557 stated Google reviewed the entire contents of two of the reported files. I reviewed these two files and a description of the file containing CSAM, which is titled *report_[1323135]*, is as follows:

> The color image depicts a prepubescent female child with light brown hair and blue eyes. An adult male penis is penetrating the female child's mouth and she is looking at the camera. The female child's hands are wrapped around the erect penis, and she has pink polish on her nails. Another individual's hand is seen on top of the female child's hand. It appears the image is a screen shot and the focus is on the prepubescent female child with the penis in her mouth. The words "Uncle Pervy" are written below the image of the prepubescent female child. The words "the cage" are written at the top right corner of the image. I believe the image depicts a prepubescent female child based upon her child-like

facial features, her child-sized hands, and her child-sized upper torso. Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, that is oral-genital sexual intercourse, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

43.     CyberTipline Report number 160076557 stated CARTY uploaded this file containing CSAM over the Internet using his Google account on April 9, 2023, at 02:57:08 UTC using IP address 193.32.249.134. IP address 193.32.249.134 is an international IP address that resolves to Amsterdam, Netherlands and is owned by 31173 Services AB, a web hosting company based out of Sweden. I believe CARTY utilized a VPN on another occasion to upload CSAM within hours of using the residential Internet to log into his Google account.

44.     On August 15, 2023, I reviewed another one of those CyberTipline Reports I received, CyberTipline Report number 164466738, in its entirety. According to CyberTipline Report 164466738, Facebook reported CARTY for uploading multiple files containing child exploitation material over the Internet using his Facebook account on June 15, 2023. During my review of CyberTipline Report number 164466738, I learned Facebook provided six files in their report to the NCMEC, five files possibly containing child exploitation material and one profile picture. CyberTipline Report number 164466738 stated the entire contents of two of the uploaded files were not viewed by Facebook. CyberTipline Report number 164466738 also stated Facebook did not provide any information on whether or not the entire contents of three of the uploaded files were viewed or publicly available.

45.     Subsequently, on August 16, 2023, I applied for and obtained a federal search

31

warrant to view the files associated with CyberTipline Report number 164466738, from United States Magistrate Judge Joel B. Toomey in Case No. 3:23-mj-1382-JBT. On August 17, 2023, I viewed the five images that were uploaded on June 15, 2023, and learned two of the files contain CSAM. Further review of CyberTipline Report number 164466738 revealed CARTY distributed a file containing CSAM, named [kAbfmWDTgsTUEAae351180152].jpg, to two different Facebook users via Facebook Messenger on June 15, 2023, at 17:33:59 UTC and 17:34:11 UTC. A description of this file is as follows:

> The color image depicts a prepubescent female child who is lying on her back. The female child is completely nude with her legs spread apart, thereby exposing her bare vagina. An adult male with an erect penis is seen on the left side of the image. The adult male's erect penis is near the female child's vagina and there is a white substance on the female child's genital area and lower abdomen. I believe the image depicts a prepubescent female child based upon the lack of pubic hair, lack of breast development, and her child-sized torso and legs. Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, that is lewd and lascivious exhibition of genitals, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

46.    On July 28, 2023, I conducted research on the Subject Location and learned by researching DAVID that Steven Lee CARTY (since May 2022), date of birth: 08/06/1968 and Violet Ann Thompson (since April 2012), date of birth: 04/21/1956 list the Subject Location as their residential address on their driver's licenses. The same date of birth for CARTY is listed for the Google account in CyberTipline Report numbers 160009245 and 160076557.

47.    On July 28, 2023, I conducted a query of the Property Appraiser's Office website in Suwannee County, Florida, and discovered Violet A Thompson is the owner of

the premises located at the Subject Location.

48.     During July and August 2023, FDLE SA Riley conducted visual surveillance at the Subject Location. On July 25, 2023, at approximately 5:15 p.m., FDLE SA Riley observed a blue Hyundai sedan parked nose-to-nose with a silver SUV on the premises with both front hoods raised. FDLE SA Riley observed CARTY working on the silver SUV until approximately 5:45 p.m. FDLE SA Riley has seen numerous photos of CARTY from his Facebook page and has also reviewed CARTY's driver license photo. Additionally, according to DAVID, CARTY is the registered owner of a 2016 blue Hyundai Sonata, bearing Florida license plate BG1 5CH, at the Subject Location and Thompson is the registered owner of a 2017 silver Subaru Forester, bearing Florida license plate Y06 BBN, at the Subject Location. It appeared that these two vehicles were the vehicles observed by FDLE SA Riley at the Subject Location.

49.     On July 26, 2023, FDLE SA Riley conducted visual surveillance at the Subject Location. At approximately 5:30 p.m., FDLE SA Riley observed CARTY's 2016 blue Hyundai Sonata traveling southbound on River Road and pull into the driveway at the Subject Location. FDLE SA Riley observed CARTY back in his vehicle and park near the residence on the premises. FDLE SA Riley later observed CARTY unloading, what appeared to be groceries, from the back seat of his vehicle. FDLE SA Riley saw the door of the residence open while CARTY was unloading his vehicle. On July 27, 2023, and July 30, 2023, FDLE SA Riley observed CARTY's 2016 blue Hyundai Sonata parked near the residence on the premises.

50.     On August 14, 2023, FDLE SA Riley conducted visual surveillance at the

33

Subject Location. At approximately 5:00 p.m., FDLE SA Riley observed CARTY's 2016 blue Hyundai Sonata parked near the residence on the premises. FDLE SA Riley observed CARTY walking in and out of the residence several times while picking up yard debris, shaking out mats, and sweeping around the residence until approximately 6:00 p.m. On August 16, 2023, FDLE SA Riley conducted visual surveillance at the Subject Location. At approximately 4:00 p.m., FDLE SA Riley observed CARTY's 2016 blue Hyundai Sonata parked near the residence on the premises.

51.     On August 16, 2023, FDLE SA Riley caused a subpoena to be issued to Suwannee Valley Electric requesting records on the residential utility account located at the Subject Location. On August 17, 2023, FDLE Riley received return information from Suwannee Valley Electric and forwarded them to me via email. I have reviewed the records in their entirety and discovered there is an active account in the name of Violet A Thompson.

52.     On August 17, 2023, I caused a summons to be issued to Windstream requesting IP address history at the Subject Location since July 1, 2022. I received return information from Windstream on August 18, 2023, and reviewed the records in their entirety. I learned the following:

a.   IP address 174.131.70.105 was assigned to the Subject Location from May 31, 2023, at 07:39:59 Central Time to June 14, 2023, at 09:22:15 Central Time and, according to CyberTipline Report number 164466738, CARTY accessed his Facebook account using the residential Internet on June 7, 2023, at 08:43:17 UTC.

34

b. IP address 173.184.178.13 was assigned to the Subject Location from March 29, 2023, at 01:19:56 Central Time to April 2, 2023, at 16:19:34 Central Time and, according to CyberTipline Report number 160076557, CARTY logged into his Google account 19 times during this time period using the residential Internet.

c. IP address 98.22.104.11 was assigned to the Subject Location from March 12, 2023, at 17:45:05 Central Time to March 27, 2023, at 21:57:06 Central Time and, according to CyberTipline Report number 160076557, CARTY logged into his Google account 46 times during this time using the residential Internet.

53.     On or about August 17, 2023, I researched Steven Lee CARTY in the Florida Sex Offender Registry, maintained by FDLE. CARTY is listed on the registry as a sex offender with previous federal convictions for possession of CSAM and receiving and distributing CSAM out of the Middle District of Florida, Jacksonville Division in 2005. The Subject Location is listed as his registered address.

## CONCLUSION

54.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computer devices, smart phones, and/or electronic storage media located on the premises located at 5614 River Road, Live Oak, Florida 32060, more fully described in Attachment A to this affidavit to, among other things, receive, transport, distribute, possess and seek child pornography. Therefore, I have probable cause to believe that one or more individuals, using the Subject Location described above has violated 18 U.S.C. §§ 2252 and/or 2252A. Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and

35

2252A, including at least one computer device and/or other electronic storage media containing images and/or video depicting child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence.

55.     I am aware that the recovery of data by a computer forensic examiner takes significant time. For this reason, the "return" inventory will only contain a list of the tangible items seized and recovered from the Subject Location and will not list electronic and digital evidence later recovered and examined by a forensic examiner.

ASHLEY WILSON, Special Agent
Homeland Security Investigations

Sworn and subscribed to via telephonic means on this _22_ day of August, 2023, in Jacksonville, Florida:

JOEL B. TOOMEY
United States Magistrate Judge

36

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises to be searched (Subject Location) is a 5-acre property located at 5614 River Road, Live Oak, Florida 32060, on which sits several independent buildings or structures of varying sizes. River Road is a paved road and is located in Suwannee County. There is a dirt driveway leading to one of the buildings on the premises that appears to be a main residence. This building appears to be a one-story, light blue mobile home. The mobile home has light-colored trim and light-colored outside window shutters. The mobile home is visible from a vantage point on River Road. There is a ramp leading to a door of the mobile home. There is a black and red mailbox on the premises near River Road with the numbers "5614" written on the side of it. Several photos of the Subject Location are set forth below:



Aerial view photo obtained from Suwannee County (Florida) Property Appraiser website:



Aerial surveillance photos of the Subject Location provided by Customs and Border Protection:



2



## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.    Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones such as an Apple iPhone or a mobile device using the Android operating system, electronic tablets such as an Apple iPad or a tablet using the Android operating system, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.    Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.     Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, transportation, distribution or seeking of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, transportation, distribution or seeking of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of seeking, distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual

depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.   Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.   Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.   Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.   Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

3

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.    Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the

4

premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.     Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

18.     Any documents, records, programs or applications relating to the existence of a Virtual Private Network on any devices.

19.     During the execution of the search of any computer device, smart phone, electronic device, and/or storage medium seized during the search of the Subject Location described in Attachment A, regarding the computer device, smart phone,

electronic device, and/or storage medium, law enforcement personnel are authorized to: 1) press or swipe the fingers (including thumbs) of Steven Lee CARTY, who is reasonably believed by law enforcement to be a user of the device(s), to the fingerprint scanner of the device(s); 2) hold the device(s) in front of Steven Lee CARTY and activate the facial recognition feature; and/or 3) hold the device(s) in front of the face of Steven Lee CARTY and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The premises located at 5614 River Road, Live Oak,<br>Florida 32060, as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:23-mj- 1398-JBT

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Middle_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

The premises located at 5614 River Road, Live Oak, Florida 32060, as further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____9/5/23_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Joel B. Toomey_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____8/22/23   11:00 a.m._____       _____
*Judge's signature*

City and state: _____Jacksonville, FL_____       Joel B. Toomey, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  3:23-mj- | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises to be searched (Subject Location) is a 5-acre property located at 5614 River Road, Live Oak, Florida 32060, on which sits several independent buildings or structures of varying sizes. River Road is a paved road and is located in Suwannee County. There is a dirt driveway leading to one of the buildings on the premises that appears to be a main residence. This building appears to be a one-story, light blue mobile home. The mobile home has light-colored trim and light-colored outside window shutters. The mobile home is visible from a vantage point on River Road. There is a ramp leading to a door of the mobile home. There is a black and red mailbox on the premises near River Road with the numbers "5614" written on the side of it. Several photos of the Subject Location are set forth below:



Aerial view photo obtained from Suwannee County (Florida) Property Appraiser website:



Aerial surveillance photos of the Subject Location provided by Customs and Border Protection:





## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones such as an Apple iPhone or a mobile device using the Android operating system, electronic tablets such as an Apple iPad or a tablet using the Android operating system, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.    Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, transportation, distribution or seeking of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, transportation, distribution or seeking of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.    Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of seeking, distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual

2

depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.      Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

3

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.    Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the

4

premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.    Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

18.    Any documents, records, programs or applications relating to the existence of a Virtual Private Network on any devices.

19.    During the execution of the search of any computer device, smart phone, electronic device, and/or storage medium seized during the search of the Subject Location described in Attachment A, regarding the computer device, smart phone,

5

electronic device, and/or storage medium, law enforcement personnel are authorized to: 1) press or swipe the fingers (including thumbs) of Steven Lee CARTY, who is reasonably believed by law enforcement to be a user of the device(s), to the fingerprint scanner of the device(s); 2) hold the device(s) in front of Steven Lee CARTY and activate the facial recognition feature; and/or 3) hold the device(s) in front of the face of Steven Lee CARTY and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

6